IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LT. ANTHONY GINALDI, : | |
|                  Plaintiff, : | |
| : | |
| v. : | Civ. No. 12-956 |
| : | |
| CAPT. KENNETH O'BRIEN, : | |
|                  Defendant. : | |

**Diamond, J.**                                                                                   **September 11, 2015**

## MEMORANDUM

The events giving rise to this civil rights matter were also the basis of a labor grievance between Plaintiff—a Philadelphia Police Lieutenant—and the City of Philadelphia. Because, in settling that grievance, Plaintiff gave up all related claims against the City and its employees, he may not now pursue the instant claims against Defendant, a Philadelphia Police Captain. Accordingly, I will grant summary judgment in Defendant's favor.

**I.      Background**

I have resolved all disputed facts and made all reasonable inferences in Plaintiff's favor.

From 2004 to early 2010, Plaintiff Anthony Ginaldi served in the Police Department's Aviation Unit. On February 9, 2010, Defendant Kenneth O'Brien—who was Plaintiff's Commanding Officer—asked the Internal Affairs Division to investigate Plaintiff. (Doc. No. 33, Ex. A.) According to Captain O'Brien, Lieutenant Ginaldi—then forty-five years old and married—was having an affair with the twenty-three year old daughter of Police Captain Mark Fisher. (Id.) Evidently, the liaison led to: 1) Plaintiff accusing Officer Ron Scott (who had informed Plaintiff's wife of the affair), of "working his privately owned business while on city time" (Doc. No. 1, Compl. ¶ 25); and 2) complaints about Plaintiff's disturbing conduct (which

subsequently formed the basis of disciplinary charges against him). (Doc. No. 33, Ex. A.) O'Brien asked that Plaintiff "be detailed out of the Aviation Unit until the completion of the investigation. (Id.) Three days later, Plaintiff was transferred from the AU and informed that pending the IAD investigation, he needed O'Brien's permission to gain access to the Unit. (Id., Ex. B.)

When Plaintiff was allowed access to the AU, he was searched upon entering. (Compl. ¶¶ 14-15.) On December 9, 2010, Plaintiff drove to the Northeast Philadelphia Airport (where the AU was based) to renew his Flight Instructor Rating. (Id. ¶ 18.) O'Brien confronted Plaintiff as he got out of his car, and ordered him to leave the Airport. (Id.) Plaintiff complied, but O'Brien filed a formal disciplinary charge in connection with this visit. (Id. ¶¶ 18-20.)

At the conclusion of the IAD investigation, Plaintiff was charged with two counts of conduct unbecoming of an officer, two counts of neglect of duty, one count of insubordination, and one count of failure to supervise subordinate officers. (Doc. No. 33, Ex. F.) These charges were based on conduct that formed the basis of O'Brien's initial request for an IAD investigation: (1) Plaintiff told three Officers not to come into work, but falsely recorded that those Officers had worked; (2) in violation of O'Brien's orders, Plaintiff scheduled snow removal training for two subordinate Officers, and then provided those Officers improper training; (3) in text message conversations with subordinate Officers, Plaintiff made disparaging remarks about O'Brien and other Officers; (4) Plaintiff sent text messages while flying; and (5) without receiving O'Brien's permission, Plaintiff took a female passenger with him on a police helicopter ride. (Id., Ex. C.) Plaintiff pled not guilty.

After a two-day hearing before a Police Board of Inquiry, Plaintiff was found guilty of four of the charges. (Id., Ex. F.) In May 2011, he was suspended without pay for fifteen days,

officially reprimanded by the Police Commissioner, permanently transferred from the AU, and removed from flight duties. (Id.)

Acting pursuant to its Collective Bargaining Agreement with the City, the Fraternal Order of Police (Plaintiff's union), filed a grievance on Plaintiff's behalf. According to the grievance, Plaintiff sought to be "Ma[d]e Whole for All Losses" he had sustained in connection with the discipline the PBI imposed: his suspension, transfer from the AU, and removal from flight duties. (Id., Ex. G.) On February 22, 2012, Plaintiff brought the instant civil rights action. He alleged that, in violation of the First Amendment, O'Brien instigated the IAD investigation to punish Plaintiff for speaking "out on . . . matters of public concern" (i.e., his accusation against Officer Scott). (Compl. ¶ 28.) Plaintiff also alleged that the restrictions O'Brien imposed during the IAD investigation and the searches of Plaintiff's person violated the Fourth and Fourteenth Amendments. (Id. ¶¶ 35-43.) Once again, Plaintiff sought "such relief as to make [him] whole, including . . . front and back pay . . . [and] equitable relief." (Compl., Prayer for Relief.)

Because the grievance and the instant matter arose from the same events, on September 6, 2012, the Parties jointly agreed to place this matter in suspense pending the resolution of the grievance proceedings. (Doc. Nos. 12, 13.) On September 10, 2013, the FOP, Plaintiff, and City reached a settlement of the grievance: in return for a broad release of claims, Plaintiff's suspension was reduced to one day, no back pay was awarded, and the insubordination and conduct unbecoming charges were reduced on Plaintiff's record to neglect of duty. (Doc. No. 33, Ex. H.) The Parties signed a formal Settlement Agreement to this effect in April 2014. (Doc. No. 33, Exs. H, I.) In addition to the reduction of Plaintiff's discipline, the Agreement provided that because "the parties wish[ed] to resolve this matter without resort to further litigation":

3

> [T]he FOP and Ginaldi . . . release the City, its departments, officials, agents, and employees from any claims they had, have, or may have arising out of, or are related to, the subject matter of the grievance.

(Id., Ex. I, Settlement Agmt. ¶ 9.) The Release is consistent with the Collective Bargaining Agreement between the FOP and the City, which provides that if a police employee elects to go to arbitration, "[t]he decision of the arbitrator shall be final and binding on all parties and the employee and/or FOP shall not pursue any other avenue of redress." (Doc. No. 33, Ex. J at 77.)

When it appeared that the Release could bar Plaintiff's § 1983 claims, at a January 9, 2015 Scheduling Conference Defendant O'Brien suggested that he would seek to dismiss on this ground. (Doc. Nos. 25, 26.) On February 27, 2015, Defendant wrote that the Release was more properly addressed at summary judgment. (Doc. No. 27 (citing Gunser v. City of Philadelphia, 241 F. App'x 40, 42 (3d Cir. 2007) (courts determine the scope of a release clause by "looking at the language of the release and the circumstances surrounding its execution")).) Accordingly, I allowed the Parties to take discovery. (Doc. No. 28.) Defendant now moves for summary judgment, which Plaintiff opposes. (Doc. Nos. 32, 34.)

## II. Request to Strike

My Order of May 11, 2015 provided that Defendant's Motion for Summary Judgement was due by June 5, 2015. Plaintiff asks me to strike O'Brien's Motion because it was filed on June 6, 2015. (Doc. No. 34 at 3-4.) I decline to do so. See Briglia v. Horizon Healthcare Servs., Inc., No. 03-6033, 2007 WL 1959249, at *3 (D.N.J. July 3, 2007) (refusing to strike a summary judgment brief as untimely because that would "result in too harsh a sanction" and collecting cases holding the same).

### III. Standard

I may grant summary judgment "if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must initially show the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). An issue is material only if it could affect the result of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). I "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. Hugh v. Butler Cnty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005). If I then determine that there is no genuine issue of material fact, summary judgment is appropriate. Celotex, 477 U.S. at 322.

Summary judgment is appropriate where the moving party shows that there is an absence of evidence to support the non-moving party's case. Id. at 325. Where a moving party identifies an absence of necessary evidence, the non-moving party "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).

### IV. Discussion

*a. Release Construction*

The Release bars claims that fall within its scope, providing the "circumstances surrounding [the Settlement Agreement's] execution" show that Plaintiff's waiver was knowing and voluntary. Gunser, 241 F. App'x at 42; Cavalieri v. Copeland, No. 07-2089, 2008 WL 4083030, at *5-6 (E.D. Pa. Aug. 28, 2008). "If the intent of the parties is unambiguous, the construction [of the Release] is a question of law which is appropriate for summary judgment." Cavalieri, 2008 WL 4083030, at *4 (quoting W.B. v. Matula, 67 F.3d 484, 497 (3d Cir. 1995),

5

rev'd on other grounds as recognized by A.W. v. Jersey City Public Schools, 486 F.3d 791 (3d Cir. 2007)). "A release is to be strictly construed and thus, covers only those matters which fairly can be represented as having been within the contemplation of the parties at the time of the release's execution." Id. (quoting Bowersox Truck Sales & Services, Inc. v. Hardco Nat'l Ins. Co., 209 F.3d 273, 281 (3d Cir. 2000)).

    *b. Release Scope*

As Plaintiff concedes, because the Release applies to "the City, its departments, officials, agents, and employees," Captain O'Brien—a Police Department employee—is within its scope. (Settlement Agmt. ¶ 9.) Plaintiff also acknowledges that his § 1983 claims "aris[e] from the *same factual setting* as the grievance." (Doc. No. 34 at 9 (emphasis in original).) Yet, Plaintiff argues that the § 1983 claims are outside the scope of the Release. (Id.) A review of the law, the record, and the Release itself confirms that when Plaintiff settled with the City, he gave up his civil rights claims.

The Release is broad: it covers "any claims [Plaintiff] had, ha[s], or may have arising out of, or are related to, the subject matter of the grievance." (Doc. No. 33, Ex. G.) All the allegations supporting Plaintiff's § 1983 claims stem from Captain O'Brien's initiation of the IAD investigation or his treatment of Plaintiff during that investigation. (Compl. ¶¶ 24-43.) Indeed, the "factual settings" of the two proceedings are so entwined as to be indistinguishable. The instant Complaint's gravamen makes this clear:

> Capt. O'Brien told Plaintiff that he was the subject of an Internal Affairs Investigation ("IAB") [sic] and was being detailed out of the Aviation Unit . . . pending the outcome of the IAB investigation.

(Compl. ¶ 12.) Plaintiff alleges that "the IAB investigation was based on the accusations Plaintiff made against P/O Scott." (Compl. ¶ 17.) As pled, "Plaintiff spoke out on a matter[s] of

public concern by [] alleging that a public official, P/O Scott, had engaged in misconduct[.]" (Compl. ¶ 28.) Plaintiff charges that in "retaliation" for thus exercising his free speech rights, he "became the subject of an IAB investigation," was transferred from the AU, "was denied access to the grounds of . . . the Aviation Unit," and was "searched" upon entering and leaving the AU, all in violation of his First, Fourth, Fourteenth Amendment rights, as well his constitutional "right to travel." (Compl. ¶¶ 29, 38, 41.)

Not surprisingly, Plaintiff sought largely the same relief in both proceedings. (Compare Doc. No. 33, Grievance, Ex. G (seeking to be "Ma[d]e Whole for All Losses"), with Compl., Prayer for Relief (seeking "such relief as to make [him] whole, including . . . front and back pay . . . [and] equitable relief").)

In these circumstances, because the "subject matter of the grievance" and instant Complaint are the same, the Release covers both.  The Third Circuit came to this same conclusion in Gunser, where four Philadelphia Police Officers—members of the Marine Unit— were disciplined and transferred from the Unit for misconduct. 241 F. App'x at 41.  Like Plaintiff here, they then filed a grievance against the City, which they settled, releasing the City from all claims "arising out of the subject matter of . . . the grievance." Id.  Like Plaintiff here, the Officers argued that the release did not apply to the civil rights claims they had brought against the City relating to the disciplinary proceedings. Id. at 42.  Finding significant language in the release that the parties "intended to resolve [the grievance] 'without resort to further litigation'" (the same language the Parties employed here), the Third Circuit ruled that the Officers could not proceed with their civil rights claims. Id. at 43 (police officers' federal law claims barred by a substantially similar release because the "propriety of the disciplinary action against [them] was part of the subject matter of the grievance, and their current claims, which

7

raise but a new challenge to the propriety of the disciplinary proceedings, clearly arise out of that subject matter"); see also Cavalieri, 2008 WL 4083030, at *5 (police officers' malicious prosecution and abuse of process claims, arising from their alleged assault of a fellow officer on May 8, 2004, were barred by a substantially similar release because "[t]he events of [that day] had ramifications . . . If not for the assault, there would not have been an investigation and that investigation would not have led to criminal charges" against the officers); cf. Bala v. Virginia Dep't of Conservation & Recreation, No. 14-1362, 2015 WL 3895468, at *4 (4th Cir. June 25, 2015) (settlement agreement barred public employee's Title VII retaliation claim when the complaint described the same "situation" giving rise to a prior grievance procedure); Nicholas v. Dep't of Health, State of Colo., No. 90-C-1050, 1990 WL 504819, at *4 (D. Colo. Dec. 26, 1990) aff'd, 951 F.2d 1259 (10th Cir. 1991) (it was "obvious to the plaintiff" that a signed release relating to her employment discrimination claim also released her unlawful discharge claim).

  *c. Release Clause Execution*

  I will enforce the Release, provided that "the totality of the circumstances surrounding [its] execution" show that the Release was "knowing and voluntary." Cavalieri, 2008 WL 4083030, at *6. I must consider whether: (1) the language is clear and specific; (2) the consideration given in exchange for the waiver exceeded the relief to which the signer was entitled by law; (3) the signer was represented by counsel; (4) the signer received an adequate explanation of the document; (5) the signer had time to reflect on the waiver; (6) the signer understood the nature and scope of the release; (7) there is evidence of fraud or undue influence; and (8) enforcement of the agreement would be against public interest. Id. (citing Matula, 67 F.3d at 497). Duress or coercion is especially difficult to make out when the releasing party was

8

represented by counsel. Campbell v. W. Pittston Borough, No. 3:09-CV-303, 2011 WL 4435402, at *13 (M.D. Pa. Aug. 23, 2011) report and recommendation adopted, No. 3:09-CV-303, 2011 WL 4442708 (M.D. Pa. Sept. 22, 2011) aff'd, 498 F. App'x 186 (3d Cir. 2012); Cuchara v. Gai-Tronics Corp., 129 F. App'x 728, 731 (3d Cir. 2005) ("Under Pennsylvania law, where the contracting party is free to come and go and to consult with counsel, there can be no duress in the absence of threats of actual bodily harm.") (citations omitted)).

These factors weigh in favor of enforcing the Release here. As I have discussed, Plaintiff agreed to the Release in exchange for the suspension reduction and disciplinary charge reclassification (factors one and two). According to the City, this facilitated Plaintiff's recent promotion to Captain. (Doc. No. 32 ¶ 12.) In resolving the grievance, Plaintiff was represented by counsel and the FOP (factor three). See Cavalieri, 2008 WL 4083030, at *6 (release clause voluntary where "the plaintiffs were represented by members of the [FOP] in filing their grievances and settling their dispute"). Although the Parties agreed to settlement terms in September 2013, Plaintiff did not sign the Settlement Agreement until some seven months later. Plaintiff thus had considerable time to consider the implications of the Release (factors four and five). See, e.g., Gregory v. Derry Twp. Sch. Dist., 418 F. App'x 148, 151 (3d Cir. 2011) (finding fifteen minutes sufficient for a plaintiff to review a release clause pursuant to a Separation Agreement); Miller v. New York City Dep't of Educ., 71 F. Supp. 3d 376, 382 (S.D.N.Y. 2014) ("[C]ourts often have held that even a *few hours* is ample time within which to review a release.") (citations omitted)). Having agreed to stay the instant case pending resolution of his grievance, Plaintiff certainly knew that the resolution of his grievance could also resolve this case (factor six). Plaintiff has not suggested any "fraud or undue influence" (factor seven). Finally, it is in the public interest to enforce clear and unambiguous waivers—especially where

the relief sought in both proceedings is largely the same, and the Plaintiff has received considerable benefit from his settlement with the City (factor eight).  Campbell, No. 3:09-CV-303, 2011 WL 4435402, at *12 ("A party may not pick and choose only those portions of a settlement that are convenient and seek selective enforcement of a settlement and release."); Joe v. First Bank Sys., Inc., 202 F.3d 1067, 1070 (8th Cir. 2000) ("Public policy favors the enforcement of voluntary settlement agreements containing release language that is unambiguous, the circumstance here."); Bala, 2015 WL 3895468, at *1 ("Having obtained the benefit of his bargain, [aggrieved public employee] cannot now seek a remedy from the courts after knowingly and voluntarily relinquishing the underlying [Title VII retaliation] claim.").

In sum, because all eight Matula factors weigh strongly in favor of enforcing the Release, I will do so.

   *d.  The Release is Not Affected by the Agreement's "Savings Clause"*

The Settlement Agreement includes the following provision:

> This agreement is not intended in any way to set precedent or to prejudice the respective positions of the parties with respect to this matter or any other future disputes, grievances, or other legal matters.

(Settlement Agmt. ¶ 7.)

Plaintiff argues that this "Savings Clause" preserves his § 1983 claims. Plaintiff thus seeks to read the Release out of existence.  Under Pennsylvania law, the Savings Clause and the Release "should be construed as consistent with one another if possible under principles of contract interpretation." Cavalieri, 2008 WL 4083030, at *6 (citing Flatley v. Penman, 632 A.2d 1342 (Pa. Super. Ct. 1993)); see also Sw. Energy Prod. Co. v. Forest Res., LLC, 2013 PA Super 307, 83 A.3d 177, 187 (2013) ("It is fundamental that one part of a contract cannot be so

interpreted as to annul another part and . . . an agreement must be interpreted as a whole." (citations omitted)).

The Savings Clause applies to "future" disputes among Plaintiff, FOP and City; the Release applies to disputes that "aris[e] from, or are related to" the subject matter of the grievance. (Settlement Agmt. ¶¶ 7, 9.) Accordingly, just as Judge Stengel did in Cavalieri, I interpret the "Savings Clause" as an agreement that Plaintiff, FOP, and City will not use "the existence of [the] Settlement Agreement against each other in future proceeding unrelated to" the grievance. Cavalieri, 2008 WL 4083030, at *6.

Assuming *arguendo* there is any tension between the two provisions, the specific Release controls the generally-worded Savings Clause. See Eighth N.-Val, Inc. v. William L. Parkinson, D.D.S., P.C., Pension Trust, 773 A.2d 1248, 1255 (Pa. Super. Ct. 2001) ("When interpreting contract language, specific provisions ordinarily will be regarded as qualifying the meaning of broad general terms in relation to a particular subject.").

In sum, the Savings Clause does not render the Release inapplicable to Plaintiff's § 1983 claims.

   e. *Arbitrability Cases Are Inapposite*

Plaintiff argues primarily that because he was not required to arbitrate his § 1983 claims, the Release does not bar him from pursuing those claims in this Court. (Doc. No. 34 at 4-8.) In support, he cites holdings that employees who agree to arbitrate violations of their collective bargaining agreement rights, may also bring claims in federal court. Alexander v. Gardner-Denver Co., 415 U.S. 36, 49 (1974); Glickstein v. Neshaminy Sch. Dist., 1997 U.S. Dist. LEXIS 16317 (E.D. Pa. Oct. 15, 1997); Blakeley v. USAirways, Inc., 23 F. Supp. 2d 560 (W.D. Pa.

1998); Barrentine v. Arkansas-Best Freight System, 450 U.S. 728 (1981); Harrell v. Kellogg Co., 892 F. Supp. 2d 716, 723 (E.D. Pa. 2012).

These cases are beside the point because they address only whether the plaintiff was obligated to arbitrate his or her federal claims, not whether that plaintiff settled his or her arbitration and related federal claims in a single agreement. The issue here is not one of arbitrability, but of contract interpretation.

**V.    Conclusion**

Once again, Plaintiff concedes that the instant Complaint "aris[es] from the same factual setting as the grievance." (Doc. No. 34 at 8.) Yet, Plaintiff argues that the Release does not apply to the instant claims because his Complaint "places at issue threshold questions which are governed by the federal constitutional [sic] and federal law concepts." (Id.) In thus emphasizing that Plaintiff's constitutional claims were not before the arbitrator, Plaintiff proves too much. The Release explicitly anticipates that the "subject matter of the grievance" could give rise to various "claims" that Plaintiff was prepared to release in return for material benefits. Having obtained those benefits, Plaintiff may not now pursue the claims he gave up. Accordingly, I will grant Captain O'Brien's Motion.

An appropriate Order follows.

/s/ Paul S. Diamond
_____
September 11, 2015                                                        Paul S. Diamond, J.